**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-10132-CIV-LEIBOWITZ/TORRES**

ALEJANDRO FIGUEROA and
ZUKI FIGUEROA,

*Plaintiffs,*

v.

BALFOUR BEATTY COMMUNITIES, LLC, *et al*,

*Defendants.*
_____________________________________________/

***REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS THE FIGUEROA FAMILY'S SHORT-FORM COMPLAINT***

This matter is before the Court on Defendants' Motion to Dismiss the Figueroa Family's Short-Form Complaint and Memorandum of Law in Support [D.E. 11][1] (the "Motion"), filed on July 30, 2026. Defendants Balfour Beatty Communities, LLC ("BBC"), Southeast Housing LLC ("Southeast Housing"), Balfour Beatty Military Housing Management LLC ("Balfour Beatty Management"), BBC Military Housing–Navy Southeast LLC ("BBC-NSE"), and Balfour Beatty Investments, Inc. ("BBI") (collectively, "Defendants" or "Balfour")[2] move to dismiss the Short-Form Complaint

---

[1] Citations to "Master D.E." refer to the docket in *In re Key West NAS Litigation*, No. 4:25-cv-10037 (S.D. Fla.); citations to "D.E." refer to the docket in this member case. Pin citations to the parties' memoranda are to the documents' internal pagination. Additionally, as there are some documents referenced where pagination differs, page numbers included herein refer to the blue docket entry stamp pagination.

[2] BBI joins in the Motion "only to the extent the Court determines it may properly exercise personal jurisdiction over BBI." [D.E. 11 at 1 n.1]. BBI's motion to dismiss

(the "SFC") [D.E. 1] filed by Plaintiffs Alejandro Figueroa and Zuki Figueroa in its entirety under Federal Rule of Civil Procedure 12(b)(7) or, alternatively, to dismiss each of its seven counts under Rule 12(b)(6) and (b). Plaintiffs filed a response in opposition on August 26, 2026 [D.E. 13] (the "Response"). The Honorable David S. Leibowitz referred the Motion to the undersigned for a report and recommendation on August 12, 2026. [D.E. 12]. Having carefully reviewed the Motion, the Response, the SFC and the First Amended Master Complaint it incorporates, the exhibits submitted with the Motion, the relevant portions of the record, and the governing law, it is Recommended that the Motion be Granted in limited part and otherwise Denied, as set forth below.

## *I. INTRODUCTION*

The Figueroas occupy an unusual position in this mass action. Unlike the scores of service-member families whose claims arise from living in privatized military housing at Naval Air Station Key West ("NAS Key West"), the Figueroas never lived there. They worked there. From 2021 to 2024, they worked as post-construction and between-occupancy cleaners in what they say were hundreds of Balfour homes, and they allege that Balfour sent them into homes with documented mold contamination and other hazards of undisclosed severity without saying so, while representing that their work environment was safe.

---

for lack of personal jurisdiction in the master docket is addressed separately. [*See* Master D.E. 161]. Nothing in this Report resolves that question.

Defendants' lead argument is procedural. They say the Figueroas worked for—and eventually managed—a cleaning company, Carmen's Clean Team, LLC, later renamed A to Z Complete Cleaning LLC (the "Vendor"), which contracted with two of the Defendants. In that contract, the Vendor assumed responsibility for warning its own employees about environmental hazards. Because it has since been administratively "dissolved," Defendants say it cannot be joined into the action. And because the Vendor cannot be joined, Defendants conclude the whole case must be dismissed under Rule 19 of the Federal Rules of Civil Procedure.

If that tidy result is not possible, Defendants alternatively contend that the negligence-based counts fail because Balfour owed the Figueroas no duty that it had not already discharged, and that the fraud-based counts fail for want of the particularity Rule 9(b) demands be pleaded.

The first two arguments ask the Court to decide, on a motion to dismiss and largely on the strength of a contract the Figueroas did not sign and that post-dates the start of their work, contested questions about who knew what, who told whom, and who was responsible for warning whom. Those are questions for a developed record, not for the pleading stage. Rule 19, moreover, does not make every potential joint tortfeasor a required party and Florida's comparative-fault regime gives Defendants a ready means of allocating fault to the Vendor whether or not it is a party. The Rule 12(b)(7) motion should thus be denied without prejudice to renewal on a fuller record, and the Rule 12(b)(6) motion should be denied as to the negligence claims, Counts II, III, V, and X.

But as to the fraud claims, the Rule 9(b) argument stands on different footing. The SFC's fraud-based counts rest on a single, undated, otherwise-unattributed representation that "Balfour" collectively represented that the Figueroas' "work environment was safe," which is more of an opinion than a statement of fact. The fraud counts also rely on an omission theory that work orders "usually" did not mention mold, but they never identify a single work order, home, date, or speaker, and that is contradicted in material respects by the SFC's own checkbox answers. [D.E. 1 at 7 ¶ 25]. These unbounded theories do not satisfy Rule 9(b), and they do not satisfy the Court's instruction in its May 14, 2026 Order that Short-Form Complaints plead fraud-based claims with particularity. Because this is the first time any court has found the Figueroas' fraud allegations wanting, however, dismissal should be without prejudice and with leave to amend.

## *II. BACKGROUND*

### *A. <u>The Master Complaint and the Short-Form Complaint Process</u>*

This mass action was brought under 28 U.S.C. § 1332(d)(2) and (d)(11) by a group of military service members and their families against private companies that own and/or operate military housing at NAS Key West. Pursuant to Case Management Order No. 1 [Master D.E. 152], Plaintiffs filed a First Amended Master Complaint ("FAMC") pleading the allegations common to all Plaintiffs [Master D.E. 175], and individual plaintiff families assert their own claims through Short-Form Complaints that incorporate the FAMC by reference. [FAMC at 1; D.E. 1 at 6 ¶ 24]. The FAMC alleges that Defendants put Plaintiffs' "health, safety, and financial

security … at serious risk" by "fail[ing] or refus[ing] to address housing problems" at NAS Key West. [Master D.E. 175 ¶ 2]. Specifically, Plaintiffs allege:

> Despite multiple investigations and admissions of guilt by Balfour entities, Defendants continued the same dangerous course of conduct with respect to military housing at NAS Key West. Their improper maintenance exposed Plaintiffs to unsafe conditions. These unsafe conditions included exposing residents to toxic mold, asbestos, cockroaches, termites, ants and other pest infestations, lead-based paint, and faulty wiring. These conditions caused Plaintiffs to come directly into contact with such dangerous substances, either touching them, inhaling them, or ingesting them.

[*Id.* ¶ 203]. Environmental testing of many Plaintiffs' homes allegedly "revealed extremely elevated levels of toxic mold," with multiple homes "found to have millions of spores per cubic meter of toxic mold … significantly more than outside controls." [*Id.* ¶ 216].

The FAMC identifies the Figueroas as "Non-Resident Plaintiffs" who "have worked in such NAS Key West housing and have been exposed to unsafe and unhealthy conditions as a result of Defendants' acts and omissions." [*Id.* at 6 n.1; *id.* ¶ 29]. It alleges that all of the NAS Key West homes at issue, "including … the NAS Key West homes at which the Figueroa Plaintiffs worked," are located in the Truman Annex, Trumbo Point, and Sigsbee Park neighborhoods. [*Id.* ¶ 150]. The Figueroas join four counts asserted by all Plaintiffs: Count II (negligence), Count III (gross negligence), Count V (negligent infliction of emotional distress), and Count X (medical

monitoring).[3] They also join three counts asserted only by Non-Resident Plaintiffs: Count XIX (fraudulent misrepresentation), Count XX (fraudulent concealment), and Count XXI (negligent misrepresentation). [Master D.E. 175 ¶¶ 242–58 (Counts II and III), 259 *et seq.* (Count V), 312 *et seq.* (Count X), 398–425 (Counts XIX–XXI); [D.E. 1 at 6 ¶ 24].

More specifically, Count II alleges that Defendants "owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their homes at NAS Key West," and that Defendants' acts and omissions, "in performance of their duties as Plaintiffs' landlords and property managers, *and as the employer of Non-Resident Plaintiffs*, fell far below the standard of care owed to Plaintiffs under Florida law." [Master D.E. 175 ¶¶ 243–44 (emphasis added)]. Count XIX alleges that Defendants "falsely assured Non-Resident Plaintiffs that they were being sent into safe working environments," knew otherwise, and "intended Non-Resident Plaintiffs to enter into and work in houses at NAS Key West based on their false representations." [*Id.* ¶¶ 399–401]. Count XX alleges that Defendants "gave Non-Resident Plaintiffs some information regarding safety conditions in NAS Key West homes but many times failed to inform them that they would be exposed to hazardous substances such as mold," and that "[h]aving started to provide Non-Resident Plaintiffs with information relating to the safety at NAS Key West, Defendants had a duty to disclose the whole truth." [*Id.* ¶¶ 407, 411]. Count XXI

[3] Plaintiffs previously withdrew Count IV (nuisance), given the Court's May 14, 2026 Order at [Master D.E. 171]. [Master D.E. 175 at 54].

repeats the "safe working environments" assurance on a negligence theory. [*Id.* ¶¶ 418–19].

On May 14, 2026, the Court granted in part and denied in part Defendants' motion to partially dismiss the Master Complaint. [Master D.E. 171]. Among other things, the Court held that claims sounding in fraud must be pleaded in the Short-Form Complaints with the particularity Rule 9(b) requires—"the who, what, when[,] where, and how" of the fraudulent conduct—and "underscore[d] that the requirements of Rule 9 must be satisfied for any applicable claim in an individual Short Form Complaint." [*Id.* at 30 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006))].

### *B.* ***The Figueroas' Short-Form Complaint***

The Figueroas filed their verified SFC on June 15, 2026. [D.E. 1]. The SFC is a form pleading. Its introductory paragraph states that Plaintiffs "worked as post-construction cleaning vendors for Defendants and were exposed to hazardous conditions including mold, lead, and asbestos." [*Id.* at 1]. Section III ("Employment and Exposure Information") alleges that Plaintiffs "worked as post-construction cleaning vendors for Defendants from 2021 to 2024, cleaning numerous homes at Naval Air Station Key West," and that during their work they "observed, contacted, ingested, and inhaled mold." [*Id.* at 2]. Through a checkbox, Plaintiffs allege that they performed work "on behalf of Defendants" in homes they "now know" were contaminated with mold, lead, and asbestos [*id.* ¶¶ 6–8]; that there were instances in which Defendants "provided Plaintiffs with insufficient or no personal protective

equipment" [*id.* ¶¶ 9–11]; and that "[o]n at least some occasions, Defendants provided Plaintiffs with partial or incomplete information regarding environmental or safety conditions, including lead, asbestos and mold," both generally and "before Plaintiffs entered a home" [*id.* ¶¶ 12–13].

Section IV ("Fraud and Misrepresentation") alleges that Defendants "engaged in a pattern of fraud, concealment, and misrepresentation concerning the hazardous conditions in the homes where Plaintiffs worked." [*Id.* at 4]. The checkbox answers that follow are these: asked whether "Defendants provided Plaintiffs with documents describing environmental hazards before Plaintiffs entered homes," Plaintiffs checked "No" [*id.* ¶ 15]; asked whether "[t]hose documents referenced lead paint," "asbestos," and "mold," Plaintiffs checked "No" to each, rather than "Yes" or "Sometimes" [*id.* ¶¶ 16–18]; and asked whether they "relied on those documents as a complete disclosure of the environmental hazards Plaintiffs would face inside the homes," Plaintiffs checked "Yes." [*Id.* ¶ 19].

Section V identifies the seven counts asserted, each against "All Defendants." [*Id.* ¶ 24]. Section VI contains the Narrative, which the undersigned quotes in full because the Motion turns on it:

> Alejandro Figueroa and his wife, Zuki Figueroa, worked as post-construction cleaning vendors for Balfour from 2021 to 2024. During that time, they cleaned numerous homes on Naval Air Station (NAS) Key West.
>
> The Figueroas later learned that many of the homes they worked in had documented mold infestations. In many cases, they were not warned before entering these homes.

The realization of prolonged exposure to hazardous materials and contact with mold has caused significant distress for the Figueroas.

When the Figueroa family began working for Balfour, Balfour represented that their work environment was safe. Balfour knew, or at minimum should have known, that many of the homes on the installation suffered from significant mold contamination.

Balfour also had a duty to warn contractors of known hazards and provide appropriate safety equipment. Balfour knew, or at minimum should have known, of the hazardous conditions and failed to warn the Figueroas or provide appropriate protective equipment.

Balfour sent the Figueroas work orders directing them as to what work to perform in a given house.

The work orders contained a section titled "environmental info." That section warned of "potential presence of" asbestos-containing materials and lead-based paint, but usually failed to provide specific warnings or mention mold.

While contractors for Balfour, the Figueroas cleaned homes on NAS Key West that had documented mold contamination. During the relevant period, the Figueroas cleaned hundreds of homes, including the following, each of which was contaminated with mold without an accurate warning of mold contamination: [twenty-one residences, identified by resident-family surname and street address, are listed].

Balfour's work order warned only of the potential presence of asbestos-containing materials and lead-based paint, and did not disclose the mold contamination or the nature and scope of lead or asbestos contamination.

The Figueroas reasonably believed that they could rely on this section of the document to warn them of any and all environmental dangers in a home. They therefore reasonably believed that the homes they were entering were free of mold contamination.

> The Figueroa family suffered anxiety, distress, and potential health problems as a direct result of the unsafe working conditions caused by Balfour's negligence and misrepresentation.

[*Id.* ¶ 25 (paragraph breaks in original)]. The twenty-one listed residences include "Serop — 1102B Dewey Road," which we revisit below in discussing Defendants' exhibits. [*Id.* ¶ 25(d)]. In Section VII (injury and health symptoms), Mr. Figueroa reports constitutional/systemic and cardiovascular/autonomic symptoms; Ms. Figueroa reports respiratory, constitutional/systemic, ENT, and hormonal symptoms. [*Id.* at 9–11]. Finally, in Section VII (damages), Plaintiffs seek economic and non-economic damages, punitive damages, and attorneys' fees. [*Id.* ¶ 26].

Two features of the SFC bear emphasis. First, the SFC never mentions Carmen's Clean Team, A to Z Complete Cleaning, or any written contract. It describes the Figueroas as "cleaning vendors for Defendants" and, in one sentence, as "contractors for Balfour." [*Id.* at 1–2, ¶ 25]. Second, it does not identify any person who spoke for "Balfour," any date on which any representation was made, or any particular work order that omitted mold.

### *C. The Motion and Its Exhibits*

Defendants first argue that the Vendor is a "required" party under Rule 19(a) because "any duty to warn the Figueroas of environmental hazards in the residences belonged solely to the Vendor" under paragraph 8.2 of the Services Agreement; that the Vendor cannot be joined because it "no longer exists as a legal entity"; and that all four Rule 19(b) factors favor dismissal because proceeding without the Vendor would risk holding Defendants "liable for the Vendor's failures, without any ability

to apportion liability to the Vendor." [D.E. 11 at 11–15]. Alternatively, Defendants argue that Counts II, III, V, and X fail because the Figueroas had at least constructive knowledge of the hazards, and because any duty to warn was discharged through the work orders and through notice to the Vendor as the Figueroas' "supervisory personnel." [*Id.* at 15–18]. Finally, Defendants argue that Counts XIX, XX, and XXI do not plead the "who, what, when, where, and how" of the alleged fraud, improperly lump the Defendants together, and rest on checkbox answers that contradict the Narrative. They move that these counts be dismissed with prejudice in light of Plaintiffs' "repeated failure to cure deficiencies." [*Id.* at 19–21].

Defendants support the Motion with the Affidavit of Evan J. Preminger, one of their counsel, which authenticates eight exhibits. [D.E. 11-9 ("Preminger Aff.")]. None of these exhibits are attached to or incorporated into either the FAMC or SFC, so on a motion to dismiss basis where we must take as true Plaintiffs' allegations, our consideration of them is necessarily limited. That said, because these exhibits feature heavily in Defendants' Rule 12(b)(7) and the Rule 12(b)(6) arguments (and, thus, are discussed below), and because we can take judicial notice of some of the exhibits that are indisputable public records, we think it helpful to provide an overview of each.

*The Services Agreement*. Exhibit 1 is Services Agreement No. KEYW-032, effective May 9, 2022, between Southeast Housing LLC as "Owner," with Balfour Beatty Military Housing Management LLC identified as "Manager," and Carmen's Clean Team, LLC as "Contractor." [D.E. 11-1 at 3]. It was executed on May 6, 2022, by Carmen Hernandez as "Contractor's Designated Representative" of Carmen's

Clean Team and by three Balfour signatories on behalf of Southeast Housing, acting through BBC-NSE. [*Id.* at 1, 17]. Its term runs "5 yrs, 7 months, 22 days" from the effective date. [*Id.* at 4]. The Figueroas are not mentioned anywhere in the Agreement.

Specifically Paragraph 4.2 provides that the Contractor "is an independent contractor and shall maintain complete control over its employees and subcontractors." [*Id.*]. Paragraph 6 requires the Contractor to "supply, operate, maintain and properly service all equipment necessary for the provision of the Services." [*Id.* at 7]. Paragraph 8.2, on which Defendants principally rely, provides, in part:

> Contractor hereby acknowledges and represents to Owner that (i) it is aware that pre-1981 constructed homes within the Premises are presumed to contain asbestos-containing materials, lead-based paint, and other Hazardous Materials (as defined below); (ii) it has been informed that certain areas within the Premises where the Services are to be performed may contain such Hazardous Materials; (iii) it has received copies of environmental reports and records regarding the Premises in the possession of the Owner, including the potential for Contractor's Services and personnel to come in contact with such Hazardous Materials referenced in such reports and records; (iv) it will alert its employees and subcontractors of any such hazards and develop appropriate health, safety and quality assurance plans and protocols to assure that they remain safe and protected therefrom, and (v) all of the Services will be performed in accordance with all Environmental Laws (as defined below).

[*Id.*]. "Hazardous Materials" is defined to include, among many other things, "mold, mildew, … asbestos, PCBs, lead-based paint." [*Id.* at 8]. Paragraph 11 recites that "Owner has engaged Manager to manage the day-to-day operation of the Premises."

[*Id.* at 9]. Paragraph 20 requires the Contractor to indemnify and hold harmless "Owner and its partners, shareholders, members, officers, directors, affiliates, agents and employees," among others, against claims arising from "any failure by Contractor, its employees or subcontractors to comply with this Agreement … and/or applicable law, including Environmental Laws," and from the "negligence, tortious acts, accidents, injuries, willful conduct, deaths and property damage … on the part of, or caused by Contractor, its employees and/or its subcontractors." [*Id.* at 11–12].

The Statement of Work appended as Exhibit A provides that the "Contractor will be responsible for ensuring the area is free of debris or any item or condition that may pose a hazard to either tenants in adjacent areas or Contractors and employees," and that the Contractor "is required to maintain an OSHA safety plan" and "is responsible for ensuring that all safety and conduct requirements of OSHA and the Property are always met and complied with by their personnel." [*Id.* at 18, 33–35 ¶¶ 4, 9].

*The Vendor's corporate records.* Exhibit 2 consists of Articles of Amendment filed with the Florida Department of State on January 12, 2024, renaming Carmen's Clean Team LLC as A to Z Complete Cleaning LLC; the filing is signed by Zuki Figueroa. [D.E. 11-2]. Exhibit 7 is a Sunbiz/State of Florida Division of Corporations printout, dated July 28, 2026, reflecting that A to Z Complete Cleaning LLC (Document No. L14000152372) was organized in 2014, that its registered agent is "Figueroa, Zuki" (a change made October 3, 2022), that its authorized persons are Alejandro Figueroa and Zuki Figueroa, each with the title "MGR," and that its status

is "INACTIVE" by reason of an "ADMIN DISSOLUTION FOR ANNUAL REPORT" with an event date of September 26, 2025. [D.E. 11-7].

We pause here to point out the importance of these records, in particular. Both Exhibits 2 and 7 appear to indicate that the original vendor, Carmen's Clean Team LLC, that entered into the contract with NAS Key West in May 2022 [D.E. 11-1 at 3] was later owned *by Plaintiffs* as A to Z Complete Cleaning LLC. (*A*[lejandro Figueroa] to *Z*[uki Figueroa] Complete Cleaning LLC, we presume.) Exhibit 7, specifically, proves this to be true, and it has been true since at least 2022.

The Sunbiz printout at Exhibit 7, in its webpage form[4], includes full PDFs for the annual reports or other events of the company. The first, dated September 30, 2014, is the Electronic Articles for Organization of Carmen's Clean Team, LLC. The document lists the registered agent as "Luz Del Carmen Hernandez" and provides the address as "19B East Circle Drive[,] Key West, Florida 33040"—the same address

[4] Rule 201 of the Federal Rules of Evidence provides that a judicially noticed fact must be "one not subject to reasonable dispute" in that it is either (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b). "In order for a fact to be judicially noticed under Rule 201(b), indisputability is a prerequisite." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5104 at 485 (1977 & Supp. 1994)). The Florida Sunbiz website is run by the State of Florida's Division of Corporations and reflects the business records the State of Florida has on file for a particular entity. These records, kept by the State of Florida and publicly displayed, are not reasonably disputable. *See ibid.* ("Since the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and in effect, directing a verdict against him as to the fact noticed, the fact must be one that only an unreasonable person would insist on disputing."). We, therefore, take judicial notice of the live webpage version of Exhibit 7, including the linked documents provided under the "Annual Reports" section.

(and, for the most part, name) as on the May 2022 Services Agreement with NAS Key West at [D.E. 11-1]. Ms. Hernandez is the agent (and "MGR") of record until an amended annual report was issued on October 3, 2022, which lists as "[a]uthorized [p]erson(s)," Alejandro and Zuki Figueroa, with the mailing address 1019 18th Street, Key West, Fl 33040—the same as on the Articles of Amendment from January 2024, in Exhibit 2 [D.E. 11-2].

In other words, according to the State of Florida's own business records, the Vendor is not missing in action—*the Vendor is Plaintiffs' LLC*. And it has been since October 2022, a mere five months after the Services Agreement with NAS Key West was signed in May 2022 [D.E. 11-1] and for a significant period of the 2021 to 2024 claims accrual period Plaintiffs allege in the SFC [D.E. 1 at 2]. (In fact, by its terms, the Services Agreement runs through December 31, 2027. [D.E. 11-1 at 3–4].) We will now continue with our review of Defendants' exhibits but indeed revisit this in detail below.

*The work orders and SNAP reports.* Exhibits 3 and 5 are two printouts of NAS Key West work orders. Both reflect a call date of August 31, 2023, and list "1102 B Dewey Road[,] Key West, Fl 33040," (the Serop residence) as the "Job Site." [D.E. 11-3 at 2[ D.E. 11-5 at 2]. Exhibit 3 appears to be an earlier work order, with the date in progress as September 1, 2023. [D.E. 11-3 at 2]. The Vendor listed is "Carmen's Clean Team LLC." [*Id.*] The "Environmental Info" is as follows:

> This home may contain asbestos-containing materials (ACM) and lead-based paint (LBP). Information about the potential presence of ACM and LBP is available in the Enviro SNAP report for this home. If there is a question or

> concern regarding the potential presence of ACM or LBP, stop work and submit an Environmental support request to your Regional or Local Environmental Specialist, or contact the Environmental Department at [their email address].

[*Id.*] Additionally, in the "Brief Desc" section, the issue is listed as "Mold." [*Id.*] This is mirrored in the "SubCategory" section, which lists "1308-Mold." [*Id.*] The Vendor signature is from "Z. Figueroa." [*Id.* at 3]. The box above that with the text "Vendor acknowledges receipt of Enviro SNAP report" was left unchecked. [*Id.*]

A SNAP report is attached as Exhibit 4, although it is dated July 2026. [D.E. 11-4]. Generally, it reflects materials that have tested either positive (drywall) or negative (asphalt shingles) for asbestos and/or lead. [D.E. 11-4 at 2–4]. The report also contains drawings of the residence. [*Id.* at 7–8].

Exhibit 5 reflects work beginning on October 10, 2023, also for the Serop residence, as in Exhibit 3. [D.E. 11-5]. The "Environmental Info" is the same, as are the "Brief Desc" ("Mold") and "SubCategory" ("1308-Mold"). [*Id.* at 2]. This work order, one month after that of Exhibit 3, lists "A to Z Complete Cleaning LLC" as the Vendor. [*Id.*] There are no Vendor notes or signatures in Exhibit 5, and the acknowledgment of SNAP report receipt checkbox is untouched. [*Id.* at 3]. Another SNAP report, also dated July 2026, is attached as Exhibit 6. [D.E. 11-6].

*The transcript.* Exhibit 8 is the transcript of the status conference held before Judge Leibowitz on January 20, 2026. [D.E. 11-8]. At that conference, the Court observed that the Figueroas "were not residents of the Naval Air Station but rather, it appears, contractor cleaners," that Counts 19, 20, and 21 appeared "unique to

themselves," and that the parties should consider, in repleading, how the Figueroas fit within the mass action. [*Id.* at 9–10, 14].[5]

### *D. Plaintiffs' Response in Opposition*

Plaintiffs respond that the Vendor is not a required party because they seek no relief from it, because Florida's comparative-fault statute permits fault to be allocated to a non-party, and because Defendants' contrary position "assumes the correctness of their own theory on liability." They add that even if the Vendor were required, the Rule 19(b) factors weigh against dismissal.

As to the Rule 12(b) arguments, Plaintiffs argue that the Services Agreement may not be considered on a Rule 12(b)(6) motion and in any event does not negate Defendants' duty to warn of hazards within their superior knowledge. And whether the work orders sufficiently warned of mold is a fact question. As to the fraud claims, Plaintiffs maintain that the SFC satisfies Rule 9(b), particularly under the relaxed standard applicable where information is peculiarly within a defendant's control. [D.E. 13 at 3–21].

Plaintiffs alternatively request leave to amend, acknowledging "some apparent inconsistencies between some of the SFC's checkbox responses and the SFC's

[5] Plaintiffs cite "MTD Ex. 8 (*In re: Key West NAS Litig.*, Hr'g Tr. at 47 (S.D. Fla. Mar. 27, 2026))" for the proposition that the Court "recognized that the SFC process would likely involve some back and forth as the parties and Court refined the SFC." [D.E. 13 at 21]. The transcript attached as Exhibit 8, however, is of the January 20, 2026, status conference and runs forty-two pages. While there was a status conference held on March 27, 2026 [Master D.E. 149], there is no transcript of it in the record, so we will not rely on that characterization. Nothing in the analysis below depends on it.

narrative" and stating that they "are willing to provide further clarification in an amended SFC." [*Id.* at 18 n.16].

## *III. APPLICABLE STANDARDS AND PRINCIPLES*

### *A. Dismissal Under Rules 12(b)(7) and 19*

Rule 12(b)(7) permits a defendant to move to dismiss for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). "Rule 19 provides the rules for mandatory joinder of parties." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011). The analysis proceeds in two steps. The court first asks whether the absent person is "required" under Rule 19(a). *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279–80 (11th Cir. 2003); *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). As relevant here, a person "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if … in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).[6]

If a required person cannot be joined, the court then determines under Rule 19(b) "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed," considering (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by

[6] Rule 19(a)(1)(B) separately addresses a person who "claims an interest relating to the subject of the action." Defendants do not invoke that provision, and the Vendor has claimed no interest here. [*See* D.E. 13 at 2 n.1].

protective provisions in the judgment, shaping the relief, or other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b). Under Rule 19, "pragmatic concerns, especially the effect on the parties and on the litigation, control." *Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980).[7]

The party asserting the Rule 19 defense bears the burden of showing that the absent person is required and, if so, that the Rule 19(b) factors warrant dismissal. *See Molinos*, 633 F.3d at 1347. Defendants cite the former Fifth Circuit's statement of the rule: "'[w]here an initial appraisal of the facts reveals the possibility that an unjoined party is arguably indispensable, the burden devolves upon the party whose interests are adverse to the unjoined party to negate the unjoined party's indispensability to the satisfaction of the court.'" *Ranger Ins. Co. v. United Hous. of N.M., Inc.*, 488 F.2d 682, 683 (5th Cir. 1974) (citing *Boles v. Greenville Hous. Auth.*, 468 F.2d 476, 478 (6th Cir. 1972)). The two formulations are not in tension: the movant must first make the "initial appraisal" showing.

Moreover, in deciding a Rule 12(b)(7) motion, the court accepts the complaint's well-pleaded allegations as true but is not confined to the pleadings and may consider evidence beyond the pleadings submitted by the parties. *See e.g.*, *Aldar Tobacco Grp., LLC v. Am. Cigarette Co. Inc.*, No. 08-62018-CIV, 2009 WL 10682051, at *1 n.1 (S.D.

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Fla. June 18, 2009) (collecting cases in noting that "[t]he Eleventh Circuit has never articulated a standard for district courts to follow in analyzing Rule 12(b)(7) motions, but its sister circuits allow for review outside the four corners of the complaint"); *Rook v. First Liberty Ins. Corp.*, 591 F. Supp. 3d 1178, 1179–80 (N.D. Fla. 2022) (the parties may present evidence beyond the pleadings) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2020) (hereinafter "FPP")); FPP § 1359 (citing *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649 (N.D. Cal. 2020) ("When considering a motion to dismiss under Rule 12(b)(7), the court accepts as true the allegations in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor.[] But the court may consider evidence outside of the pleadings.") (internal citations omitted), *aff'd on other grounds*, 17 F.4th 930 (9th Cir. 2021), *cert. denied*, 143 S. Ct. 562 (2023)).

Because dismissal for nonjoinder ends a case without reaching its merits, courts are reluctant to order it where the action can fairly proceed; and a defense of failure to join a person required by Rule 19(b) is not waived if not raised at the outset, but may be asserted later in the case, including at trial. *See* Fed. R. Civ. P. 12(h)(2).

### *B. Dismissal Under Rule 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor, *see Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012), but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Review is generally limited to the four corners of the complaint and any attached exhibits. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). Under the incorporation-by-reference doctrine, however, a court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the document is (1) central to the plaintiff's claim and (2) its authenticity is undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

### *C. Dismissal of Fraud Claims Under Rule 9(b)*

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," while "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The rule "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). It is satisfied if the complaint

sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* (citation and internal quotation marks omitted); *accord Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997). Put more simply, a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Garfield*, 466 F.3d at 1262; *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022). "[I]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Ambrosia Coal & Constr. Co. v. Pagés Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (quoting *Brooks*, 116 F.3d at 1381).

At the same time, Rule 9(b) must be read in conjunction with Rule 8(a) so its application "must not abrogate the concept of notice pleading." *Ziemba*, 256 F.3d at 1202 (quoting *Durham*, 847 F.2d at 1511). "[A]llegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, [but] alternative means are also available to satisfy the rule." *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting *Durham*, 847 F.2d at 1512). And the standard "may be applied less stringently . . . when specific factual information [about the fraud] is peculiarly within

the defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (unpublished) (internal quotation marks omitted); *see also United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002).

Rule 9(b) applies to claims for fraudulent misrepresentation and fraudulent concealment, and—because such claims sound in fraud under Florida law—to claims for negligent misrepresentation as well. *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127–28 (11th Cir. 2019).

## ***IV. ANALYSIS***

### ***A. Defendants Have Not Shown That the Vendor Is a Required Party, and Dismissal Is Not Warranted Even If It Were***

Defendants' Rule 19 argument proceeds in three steps: the Vendor "wholly assumed" any duty to warn the Figueroas; the Vendor "no longer exists" and so cannot be joined; and proceeding without it would prejudice Defendants because they might be held liable "for the Vendor's failures, without any ability to apportion liability to the Vendor." [D.E. 11 at 12-15]. Each step rests on a premise that the present record does not establish, and the argument as a whole misconceives what Rule 19(a)(1)(A) requires.

#### ***1. The Complexity of the Vendor's Identity***

In ruling on a motion to dismiss, we must accept as true Plaintiffs' factual allegations. So no matter how heavily they are cited in their motion, Defendants' exhibits are not creatures of either complaint and we cannot rely on them for the

purposes of dismissal, except where, as analyzed for Exhibits 3 and 5 below, Plaintiffs agree.[8] That said, we have gone to the step of taking judicial notice of the officially kept, and not reasonably disputable, Florida Division of Corporations records at Exhibit 7 (and its live webpage version). These records reveal that on some level the Figueroas had managerial or leadership involvement in a later iteration of Carmen's Clean Team LLC – A to Z Complete Cleaning LLC.

The parties' existing dismissal arguments on joinder of the Vendor all essentially rest on the cornerstone assumption that the Figueroas' employer may or may not have some potential responsibility relative to their claims. Defendants argue that the employer assumed responsibility via contract and is thus a necessary party without whom the case cannot proceed. Plaintiffs disagree that the Vendor is a necessary party to the action but acknowledge that there may be a possibility that the Vendor may also have breached a duty to the Figueroas. [D.E. 13 at 4-5]. And the parties' arguments on dismissal are, as necessary, consistent with the narrative in the SFC, which casts the Figueroas as mere "post-construction cleaning vendors," who were only provided work orders that contained limited information as to the Balfour property being serviced. [D.E. 1 at 7–9].

---

[8] As cited above, there is some case law suggesting that courts may consider evidence outside of the pleadings for a Rule 12(b)(7) challenge. Given, however, that the Eleventh Circuit has not yet opined on this issue, and that doing so is not necessary for this analysis, we will not engage in an extensive evidentiary analysis based on Defendants' motion to dismiss exhibits. That said, and for the reasons iterated in this section, we would be remiss not to acknowledge its possible implications—if for no other reason than it bears on why, perhaps, the Vendor was never made a party.

But the now-apparent fact that the Figueroas were involved in the management or leadership of the business by which they were employed is a sea change compared to the parties' arguments on dismissal. Defendants' motion briefly alludes to Zuki Figueroa acting as "manager or authorized representative" for the Vendor entity who took part in the changeover from Carmen's Clean Team LLC to A to Z Complete Cleaning LLC. Yet it does not seem to entirely grasp the completeness of the change suggested by the exhibits they themselves have included. [D.E. 11 at 8–9]. As analyzed above, Exhibit 7 indicates that the Figueroas, in some capacity, took over the cleaning business within months of the Services Agreement taking effect. And by dent of the allegations and claims period here, they appear to have performed services pursuant to the agreement.

This inherently alters the fundamental assumption of the parties' briefing: that the Figueroas were somehow separate from the Vendor for the purposes of a tort and, thus, joinder in this case. And, yes, literally, an LLC is a separate corporate entity. But for purposes of context, such as why the Vendor (by any name) was never made a defendant in this lawsuit, the discovery that the Figueroas are listed as authorized persons on its business records as of October 2022 (and that Carmen Hernandez no longer appears after that date) is materially relevant to the motion to dismiss "boogeyman" character of the parties' briefing that is the un-joined, now-dissolved Vendor.

While we believe that the effect of this can only bolster our conclusion that at least Plaintiffs' negligence claims are premised heavily on questions of fact and thus

not fit for dismissal, we point this out because the parties' motions are so focused on arguing with the Vendor effectively in absentia. The facts of the Vendor, however, are directly complicating factors of the question of joinder. (And despite this being vaguely acknowledged in the parties' briefing, neither party engages.) So, while none of this has ultimately changed our conclusions on dismissal, at least Exhibit 7 stands to create myriad other questions and issues that the parties will need to, at some future point, address (*i.e.* what did the Figueroas know of the Services Agreement and when?). With this in mind, we will proceed with our analysis of the parties' arguments as they presented them.

***2. The Vendor is not a required party under Rule 19(a)(1)(A)***

Rule 19(a)(1)(A) asks whether, in the absent person's absence, "the court cannot accord complete relief among existing parties." The phrase "among existing parties" is the key. The question is whether the court can grant the plaintiff the relief it seeks against the defendants who are before it, and whether the defendants can obtain a judgment that resolves the plaintiff's claims against them. The Rule does *not* resolve whether some other person might also be liable, or whether the defendants would prefer to have that person share the judgment.

These principles were fully analyzed in *Temple v. Synthes Corp.*, 498 U.S. 5 (1990) (per curiam), a products-liability case in which the manufacturer moved to dismiss for failure to join the surgeon and hospital that it blamed for the plaintiff's injury. The Supreme Court's reasoning is dispositive here. *Temple* reversed a dismissal under Rule 19: "It has long been the rule that it is not necessary for all joint

tortfeasors to be named as defendants in a single lawsuit," and "[t]he Advisory Committee Notes to Rule 19(a) explicitly state that 'a tortfeasor with the usual "joint-and-several" liability is merely a permissive party to an action against another with like liability.'" *Id.* at 7 (quoting Fed. R. Civ. P. 19(a) advisory committee's note (1966)). Because the surgeon and hospital in *Temple* were "potential joint tortfeasors," they "were merely permissive parties," and "no inquiry under Rule 19(b) [was] necessary, because the threshold requirements of Rule 19(a) ha[d] not been satisfied." *Id.* at 8. The Court also noted the obvious alternative available to a defendant that wishes to shift responsibility: the manufacturer had not "attempt[ed] to bring the doctor and the hospital into the federal action by means of a third-party complaint, as provided in Federal Rule of Civil Procedure 14(a)." *Id.* at 6.

*Temple* thus disposes of Defendants' core theory. The Figueroas seek money damages from Defendants for Defendants' own alleged negligence and misrepresentations. They seek nothing from the Vendor, as a corporate entity, and the Vendor itself levies no claims here. If the Figueroas prove their case, a judgment against Defendants will afford them complete relief as to the case they brought; if they do not, a judgment for Defendants will afford Defendants complete relief. The Vendor's absence prevents neither outcome. Defendants' real contention is that the Vendor, not they, is the party that should answer for any failure to warn. That is a merits defense and, at most, a contention that the Vendor is a joint tortfeasor whose fault should be compared with theirs. Under *Temple*, and Rule 19, it does not make the Vendor a required party.

Florida law reinforces the point. Defendants themselves invoke Florida's comparative-fault statute, Fla. Stat. § 768.81(3), but the statute cuts against them.[9] Section 768.81(3) directs that in a negligence action "the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability," and subsection (3)(a) expressly contemplates the allocation of "any or all fault to a nonparty," provided the defendant "affirmatively plead[s] the fault of a nonparty" and identifies it. Fla. Stat. § 768.81(3)(a)1–2.

Accordingly a party's percentage of fault must be determined by comparison "to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants." *Fabre v. Marin*, 623 So. 2d 1182, 1185 (Fla. 1993); *see Nash v. Wells Fargo Guard Servs., Inc.*, 678 So. 2d 1262,

[9] Section 768.81 specifically allows for apportionment as follows:

> In a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability.
>
> []In order to allocate any or all fault to a nonparty, a defendant must affirmatively plead the fault of a nonparty and, absent a showing of good cause, identify the nonparty, if known, or describe the nonparty as specifically as practicable, either by motion or in the initial responsive pleading when defenses are first presented, subject to amendment any time before trial in accordance with the Florida Rules of Civil Procedure.
>
> []In order to allocate any or all fault to a nonparty and include the named or unnamed nonparty on the verdict form for purposes of apportioning damages, a defendant must prove at trial, by a preponderance of the evidence, the fault of the nonparty in causing the plaintiff's injuries.

Fla. Stat. § 768.81(3)(a)(1)–(2).

1264 (Fla. 1996) (defendant must plead the non-party's negligence as an affirmative defense and specifically identify the non-party). The very case on which Defendants rely for the proposition that notice to a contractor's management discharges an owner's duty to warn illustrates the mechanism: there, the jury apportioned fault seventy percent to the non-party independent contractor that employed the decedent, twenty percent to the owner, and ten percent to the decedent. *Indian River Foods, Inc. v. Braswell*, 660 So. 2d 1093, 1095–96 (Fla. 4th DCA 1995). The prejudice Defendants posit – that they "would be found liable for the Vendor's failures, without any ability to apportion liability to the Vendor" [D.E. 11 at 14] – is one that Florida law has already eliminated, at least as to the negligence-based counts.[10]

Defendants' contract-based framing does not change the analysis. Defendants say that because the Services Agreement "defines the duties the parties have to each other," the Court "must interpret the contract" to determine whether any liability remains with Defendants, and that "[a]ll parties to a contract are generally required parties in 'actions to determine rights and obligations under a contract.'" [D.E. 11 at 13 (quoting *PC Specialists, Inc. v. Micros Sys., Inc.*, No. 10-CV-78, 2011 WL 3475369, at *3 (S.D. Cal. Aug. 9, 2011))]. But this is not an action on the Services Agreement. The Court need not interpret the contract to assess Plaintiffs' liability theories. The

[10] Section 768.81 does not apply to intentional torts. Fla. Stat. § 768.81(4). But Defendants' theory of the Vendor's responsibility, a contractual undertaking to warn its own employees, sounds in negligence, and Defendants do not explain how the Vendor's alleged failure to pass along warnings could make Defendants liable for a fraud they did not commit. If the Figueroas cannot prove that Defendants themselves made knowingly false statements or concealed facts they had a duty to disclose, the fraud-based counts fail on their own terms, with or without the Vendor.

contract may be relevant to Defendants' affirmative defenses, or relevant to damages, or relevant to notice for either types of claims, but the interpretation of the contract is not a prerequisite to prima facie relief on these negligence claims.

In other words, the Figueroas' negligence claims arise from the common-law duties that Florida imposes on one who has work done on its premises by an independent contractor, *see Fla. Power & Light Co. v. Robinson*, 68 So. 2d 406, 410–11 (Fla. 1953), and on one who undertakes to provide a service to others, *see Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003). Whether the Services Agreement bears on those duties (as evidence of what the Vendor was told, what the Figueroas may have known and when, whether they assumed any responsibility, or, generally, of the parties' allocation of responsibility) is a question the parties may litigate as the case stands. The Vendor's contractual undertakings would be a "facet of the general facts of the case," *Clay Elec.*, 873 So. 2d at 1185[11], not the source of the Figueroas' rights.

And, what's more, taking Exhibit 7 as true for the sake of argument cuts in Plaintiffs' favor here on the issue of joinder: Defendants, if the Figueroas had

[11] "The principle of 'duty' [in a negligence claim] is linked to the concept of foreseeability and may arise from four general sources: '(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.' *McCain v. Fla. PowerCorp.*, 593 So.2d 500, 503 n.2 (Fla. 1992). The present cases fall within the fourth category, i.e., the duty arises 'from the general facts of the case.' To the extent the parties rely on an alleged contract between [the plaintiff] and [a third party] to support the proposition that [the plaintiff] owed, or did not we, a legal duty to [a decedent/defendant], the contract itself is but one facet of the general facts of the case." *Clay Elec.*, 873 So. 2d at 1185.

leadership or management involvement in the cleaning business, have ready access to information about such things as Plaintiffs' involvement, knowledge, and performance of the contract, just by virtue of them being Plaintiffs. In other words, if for the sake of argument we take as true what Defendants appear to suspect of the Figueroas based on their motion exhibits, why must the Vendor be joined, factually speaking, if the Vendor was related to them? There would then be no prejudice in gathering what is functionally the same information by way of regular discovery involving the Plaintiffs here.

Further, even if Rule 19(a)(1)(A) could be satisfied by a showing that a non-party bears *sole* responsibility for the harm alleged, Defendants have not made that showing on this record. Their argument depends on reading paragraph 8.2 of the Services Agreement as assigning the duty to warn "solely" to the Vendor. [D.E. 11 at 12]. Paragraph 8.2 does not say that. It records the Contractor's acknowledgment that certain, "pre-1981" homes are "presumed to contain" hazardous materials, that "certain areas" where services are to be performed "may contain" such materials, that it has received environmental reports, and that it "will alert its employees and subcontractors of any such hazards." [D.E. 11-1 at 7]. Nothing in the paragraph purports to relieve the Owner or Manager of any duty they owe under Florida law to persons entering the premises, and the indemnity in paragraph 20 is triggered by the *Contractor's* failures, not by Defendants' own. [*Id.* at 7, 11–12]. Whether an owner that has undertaken to provide environmental information directly to a contractor's workers, through work orders addressed to them, may then disclaim any duty

concerning the accuracy or completeness of that information is precisely the kind of question that cannot be resolved by pointing to a boilerplate acknowledgment in a vendor agreement.

The record submitted on the motion also raises factual questions that Defendants' argument glosses over. For example, the Services Agreement took effect on May 9, 2022 [D.E. 11-1 at 3], but the SFC alleges that the Figueroas began working at NAS Key West in 2021 [D.E. 1 at 2, 7]. Defendants offer no explanation to bridge the 2021 to 2022 gap. Notwithstanding anything that may have happened with the Services Agreement after the Figueroas apparent involvement, the 2021 to 2022 time period presents an unaddressed factual issue. And the FAMC, which the SFC incorporates, alleges that Defendants acted "as the employer of Non-Resident Plaintiffs." [FAMC ¶ 244]. Whether that allegation will survive discovery is another matter, but at this stage it must be accepted as true, and it is flatly inconsistent with Defendants' premise that the Vendor, and only the Vendor, stood between Defendants and the Figueroas. Rule 12(b)(7) permits the Court to look beyond the pleadings, but it does not permit the Court to resolve genuinely disputed facts in the movant's favor.

***3. Defendants have not shown that joinder is infeasible***

Even if the Vendor were a required party, Rule 19(a)(2) would direct that it "be made a party," not that the case be dismissed. Fed. R. Civ. P. 19(a)(2). Rule 19(b) comes into play only if the required person "cannot be joined." Fed. R. Civ. P. 19(b). Defendants' sole basis for asserting infeasibility is that the Vendor was administratively dissolved for failure to file an annual report and therefore "no longer

exists at all." [D.E. 11 at 8]. That is not what Florida law provides. Under the Florida Revised Limited Liability Company Act, "[a] limited liability company that has been administratively dissolved continues in existence but may only carry on activities necessary to wind up its activities and affairs, liquidate and distribute its assets, and notify claimants." Fla. Stat. § 605.0714(5). Winding up expressly includes the power to "[p]rosecute and defend actions and proceedings, whether civil, criminal, or administrative." Fla. Stat. § 605.0709(2)(b)2. "The administrative dissolution of a limited liability company does not terminate the authority of its registered agent for service of process," Fla. Stat. § 605.0714(6), and here the registered agent of record is Ms. Figueroa herself. [D.E. 11-7]. The managers in office at dissolution, moreover, become "trustees for the members and creditors of the dissolved limited liability company." Fla. Stat. § 605.0709(8). And apart from all that, a Florida limited liability company may also apply for reinstatement. *See* Fla. Stat. § 605.0715. So it is not literally true that the Vendor does not exist at all. Factually and legally, the Vendor can be resuscitated if that was essential to resolution of these claims.

Defendants do not address any of these provisions. They have therefore not shown that the Vendor is beyond the reach of process, that it could not be impleaded under Rule 14(a) on Defendants' own indemnity theory, or that it could not be identified as a non-party on the verdict form. Particularly given the foregoing, this is not to say that an action could presently be maintained against the Vendor, or on what terms one could be; but the point is that Defendants bear the burden on this element and have not carried it. Nor would joinder threaten subject-matter

jurisdiction: this action rests on the minimal-diversity provisions of 28 U.S.C. § 1332(d) (i.e., CAFA jurisdiction), and the addition of a Florida defendant, in the grand scheme of the broader class action, would not disturb them. *See Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006).

#### *4. The Rule 19(b) factors do not favor dismissal in any event*

Assuming, contrary to the foregoing, that the Vendor were both required and unjoinable, "equity and good conscience" would not call for dismissal. Fed. R. Civ. P. 19(b). Defendants' arguments under the first three factors[12] are, as Plaintiffs observe, circular: each assumes that "[a]ny relief whatsoever that comes from the current Defendants would . . . be unwarranted" because the Vendor alone was at fault. [D.E. 11 at 14]. But that is the merits question the case exists to decide. If Defendants owed and breached no duty, they will prevail; if they did, a judgment against them for their

---

[12] Rule 19(b), when joinder is not feasible, proceeds as follows:

If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice would be lessened or avoided by: []protective provisions in the judgment; []shaping the relief; or []other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b)(1)–(4).

own share of fault, with the Vendor's share allocated under § 768.81, is neither prejudicial nor inadequate. Because the relief sought is money damages, the second factor, shaping the relief, largely takes care of itself through comparative-fault apportionment. *See Molinos*, 633 F.3d at 1344-47 (as part of a Rule 21 analysis for misjoinder, where a Rule 19(b) assessment is the first step: finding no prejudice, and rejecting indispensability, where the remaining defendant would simply pay money damages and nothing required him to breach any duty to the absent parties).

The fourth factor also weighs heavily against dismissal. Defendants concede that the Figueroas have "no alternative remedy at all," but argue that dismissal "can still be appropriate" because the fourth factor cannot "'overcome the weight of the other three.'" [D.E. 11 at 15 (citing *Fla. Wildlife Fed'n Inc. v. United States Army Corps of Eng'rs*, 859 F.3d 1306, 1319–20 (11th Cir. 2017))]. But the authorities Defendants cite are inapposite.

For example, many involve absent sovereigns or tribes whose immunity forecloses joinder: *Republic of Philippines v. Pimentel*, 553 U.S. 851, 854–55 (2008) ("this case turns on the interpretation and proper application of Rule 19 of the Federal Rules of Civil Procedure and requires us to address the Rule's operation in the context of foreign sovereign immunity. This interpleader action was commenced to determine the ownership of property allegedly stolen by Ferdinand Marcos when he was the President of the Republic of the Philippines."); *Klamath Tribe Claims Committee v. United States*, 106 Fed. Cl. 87, 96 (2012) (finding that plaintiff would be "left without any ability to recoup compensation for the injuries it claims," "[b]ut there are

countervailing considerations[]. Courts generally afford sovereigns 'heightened protection' if a lawsuit poses 'a potential of injury to the sovereign's interest.'") (citing *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1181 (11th Cir. 2011), *aff'd sub nom. Klamath Claims Comm. v. United States*, 541 F. App'x 974 (Fed. Cir. 2013); *Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1284 (10th Cir. 2012) (affirming where district court found Rule 19(b) factors favored dismissal because of sovereign immunity). All these cases reflect the special weight accorded sovereign immunity in the Rule 19(b) balance. Nothing comparable is present here.

And Defendants' suggestion that the Figueroas forfeited any alternative remedy through their "own conduct" in allowing the Vendor to lapse [D.E. 11 at 15] would, if accepted, produce a remarkable result: a plaintiff's failure to file her company's annual report would extinguish her personal-injury claims against strangers to that company. Rule 19 is not a vehicle for that outcome and Defendants cite no persuasive authority that says otherwise. *Cf. City of Marietta v. CSX Transp., Inc.*, 196 F.3d 1300, 1307 (11th Cir. 1999) (declining to order dismissal under Rule 19(b) even where the plaintiff had another adequate forum—"the delay of sending litigation that is so advanced to another forum counsels going forward").

***5. Disposition of the Rule 12(b)(7) motion***

Accordingly, the Rule 12(b)(7) Motion should be Denied insofar as it seeks dismissal under the Rule. Because the Rule 19 inquiry is fact-dependent, and because a defense of failure to join a person required by Rule 19(b) may be raised "at trial,"

Fed. R. Civ. P. 12(h)(2)(C), the denial should be without prejudice to Defendants' right to renew the argument on a developed record.

### *B. The Negligence-Based Claims (Counts II, III, V, and X) Should Not be Dismissed as They State Plausible Claims*

Defendants' attack on Counts II, III, V, and X is confined to a single element. They do not argue that the SFC fails to allege breach, causation, or damages, and they do not raise any count-specific defect (such as the impact rule for negligent infliction of emotional distress or the elements of a medical-monitoring claim) independent of the duty question. [D.E. 11 at 10–13; D.E. 11-11 (Appendix A, items 12–13)]. Rather, Defendants contend that the negligence-based counts fail as a matter of law because (1) the Figueroas had at least constructive knowledge of the hazards, so no duty to warn arose, and (2) any duty that did arise was discharged by the work orders and by notice to the Vendor. [D.E. 11 at 11–13]. Neither contention can be sustained at the pleading stage.

#### *1. An owner's duty to the employees of an independent contractor*

The parties agree on the governing framework. Generally under Florida law, "a property owner who employs an independent contractor to perform work on his property will not be held liable for injuries sustained by the employee of an independent contractor during the performance of that work." *Strickland v. Timco Aviation Servs., Inc.*, 66 So. 3d 1002, 1006 (Fla. 1st DCA 2011) (citing *Ahl v. Stone Southwest, Inc.*, 666 So. 2d 922, 924 (Fla. 1st DCA 1995)). But the rule has long had an exception for latent dangers known to the owner. As the Florida Supreme Court states in *Robinson*, "[a] person who is having work done on his premises by an

independent contractor, and has actual or constructive knowledge of latent or potential dangers on the premises, owes a duty to give warning of, or use ordinary care to furnish protection against, such dangers to employees of the contractor and subcontractor who are without actual or constructive notice of the dangers." 68 So. 2d at 411 (internal quotation marks and citation omitted); *accord Indian River Foods*, 660 So. 2d at 1096; *Johnson v. Boca Raton Cmty. Hosp., Inc.*, 985 So. 2d 593, 596 (Fla. 4th DCA 2008); *Strickland*, 66 So. 3d at 1007.

The necessary inquiry thus has three parts: "Did the [owner] have actual or constructive knowledge of the defect which caused the injury? Did the defect constitute a latent danger? Did the plaintiff have actual or constructive notice of the danger?" *Robinson*, 68 So. 2d at 411. No duty exists where the danger is "open and apparent or readily ascertainable," *Strickland*, 66 So. 3d at 1007, or where it is "the very hazard created by the doing of the contract work[,]" *Johnson*, 985 So. 2d at 596-97 (citation omitted). And the duty, where it exists, "is sufficiently discharged if the owner gives appropriate notice to the independent contractor's supervisory personnel." *Indian River Foods*, 660 So. 2d at 1096.

Two further principles bear on the analysis. First, an owner's knowledge that a hazard exists is not discharged by a generic warning that leaves the specific hazard concealed. In *Robinson*, for instance, the utility knew from its own inspections that a particular pole was rotten below ground, but its work sheets designated every pole to be replaced simply as "bad," a classification used for a variety of defects. The Court held that the "bad" designation "cannot be held to have imported notice of concealed

defects which the linemen could not have discovered by the exercise of ordinary care, when that designation was used for all poles to be replaced … for any of a number and variety of reasons," and affirmed a verdict for the injured lineman. 68 So. 2d at 411–13.

Second, apart from premises-based duties, "[w]henever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service . . . thereby assumes a duty to act carefully and to not put others at an undue risk of harm," a doctrine that "applies not just to parties in privity with one another . . . but also to third parties." *Clay Elec.*, 873 So. 2d at 1186.

### *2. The scope of review*

Before applying Florida law, we must decide what may or may not be considered. Defendants ask the Court to rely on the Services Agreement and on the work-order exhibits under the incorporation-by-reference doctrine. [D.E. 11 at 8 nn.4–5]. The work orders present the easier question so we start there. The SFC expressly alleges that "Balfour sent the Figueroas work orders," describes their "environmental info" section, and rests both its negligence and its fraud theories on what those work orders did and did not say. [D.E. 1 at 7–9 ¶ 25]. Plaintiffs do not dispute the authenticity of Exhibits 3 and 5 and concede that Defendants "are justified in relying on the example work orders." [D.E. 13 at 13].

It is, therefore, proper to consider them for what they are and nothing more: two work orders, spaced approximately a month apart, for a single NAS Key West

residence. Indeed, and as reviewed above, the work orders do include issue-description mentions of mold and contain language regarding possible lead and asbestos in the "environmental info" section of each. [D.E. 11-3 at 2; 11-5 at 2]. But as Plaintiffs point out, the SFC alleges that he Figueroas cleaned "hundreds of homes," and list at least twenty-one in the narrative. [D.E. 1 at 7–9 ¶ 25]. What two, related work orders for two months in 2023 say about one bathroom in one home cannot establish what the Figueroas were told about the other twenty homes, or the alleged hundreds beyond them.

The Services Agreement is different. The SFC does not mention it, does not rely on it, and does not depend on it. And, irrespective of the reason, the Vendor is not even named in the SFC. Plaintiffs plead their claims as arising from duties the as-pleaded Defendants owed to them as persons working in its homes, not from any contract. A document is "central" to a claim when it is "a necessary part of [the plaintiff's] effort to make out [the] claim," *Day*, 400 F.3d at 1276, not when the defendant believes it supplies a defense. That the SFC once describes the Figueroas as "contractors for Balfour" [D.E. 1 at 8 ¶ 25] does not make every contract Balfour ever signed with any cleaning company central to the Figueroas' claims or cause an agreement from 2022 to apply retroactively. The Services Agreement accordingly should not be considered under Rule 12(b)(6).[13]

[13] Defendants do not ask, in the alternative, that the Motion be converted to one for summary judgment under Rule 12(d), and conversion would in any event be inappropriate before Plaintiffs have had any opportunity for discovery.

In any event, the result would be the same if the Services Agreement were considered. Nothing in the Agreement identifies any particular home as containing mold or represents that any warning about any particular home was given to anyone. Paragraph 8.2 is a general acknowledgment that "pre-1981" homes are "presumed" to contain hazardous materials and that "certain areas" "may" contain them. [D.E. 11-1 at 7–8]. That is, in substance, a "bad" designation applied to every home on the installation. Whether such a generic acknowledgment –in a contract signed by someone other than the Figueroas, a year after they began working – discharged an owner's duty to warn of specific, documented mold infestations known to the owner is a question that *Robinson* answers, if at all, *against* Defendants. At minimum, that is a claim-dispositive question that cannot be answered against Plaintiffs on the pleadings.

### ***3. The SFC plausibly alleges a duty to warn***

Measured against *Robinson*'s three inquiries, the SFC here states a plausible claim. As to the owner's knowledge, it alleges that Balfour "knew, or at minimum should have known, that many of the homes on the installation suffered from significant mold contamination," and that the homes the Figueroas cleaned "had documented mold infestations." [D.E. 1 at 7 ¶ 25]. The FAMC alleges that environmental testing revealed "extremely elevated levels of toxic mold" in many homes and that Defendants' own maintenance and remediation practices caused the conditions. [FAMC ¶¶ 203, 216]. Defendants' own exhibits corroborate the plausibility of the allegation. For example, Exhibit 3, for Work Order No. 8955424

was opened under the description "Mold," categorized "Environmental / 1308-Mold," and annotated by Balfour technicians with findings of "condensation," "bubbling," "high readings," and the need to remove drywall to locate "the source of high moisture." [D.E. 11-3 at 2].

As to latency, the SFC alleges that the Figueroas "later learned" of the contamination and "were not warned before entering these homes," and that they "reasonably believed that the homes they were entering were free of mold contamination." [D.E. 1 at 7, 9 ¶ 25]. Mold within wall cavities and ceilings is not self-evidently an "open and apparent" condition to a cleaner arriving after construction. And as to the Figueroas' own knowledge, the SFC alleges that they lacked it, that "[i]n many cases" they were given no warning, and that the "environmental info" section on which they relied "usually failed to provide specific warnings or mention mold." [*Id.* at 7–9 ¶ 25]. Those allegations, and the inferences to be drawn from them, must be accepted as true. *See, e.g., Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) ("When considering a motion to dismiss, all facts . . . 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'") (quoting *GSW, Inc. v. Long City*, 999 F.2d 1508, 1510 (11th Cir. 1993)).

The SFC also plausibly alleges an undertaking. According to the SFC, and confirmed by Defendants' Exhibits 3 and 5 (and, to a degree, Exhibit 7), Balfour itself sent work orders to either the Vendor or the Figueroas[14], and those work orders

[14] Exhibit 3, at least, also reflects receipt by "Z. Figueroa." [D.E. 11-3].

contained a section captioned "Environmental Info" that purported to convey environmental information about the specific home to be cleaned. [D.E. 1 at 7 ¶ 25; D.E. 11-3 at 2]. Whatever the Services Agreement may have said about the Vendor's obligations to its own workers, there is at least some evidence that Defendants communicated environmental information directly to the Figueroas via work order. And an owner that elects to communicate environmental information directly to a contractor's personnel/employees of the Vendor about the particular home they are about to enter has undertaken to do so with reasonable care. *Clay Elec.*, 873 So. 2d at 1186. Whether the information conveyed was reasonably complete (whether, for example, a section warning of "potential" asbestos and lead but silent about mold, on a work order for a home the owner had itself classified as a mold job, was misleading) is a question of breach, not of duty.

### *4. Defendants' contrary arguments raise fact questions, not pleading defects.*

Defendants' arguments to the contrary are serious, and some may ultimately prevail. But each requires the Court to draw inferences against the Figueroas from a record that has not been made. That we cannot do on a Rule 12(b)(6) motion.

*Constructive knowledge.* Defendants argue that because the Figueroas were "doing post-construction cleaning work in older buildings in a humid environment," and because some work orders were captioned "Mold" or "moisture," "it is not plausible that the Figueroas were unaware of the possibility of mold." [D.E. 11 at 17–18]. Talk about an argument laden with inferences in Defendants' favor. Every home in South Florida has the "possibility" of mold; the SFC, however, alleges that these

homes had "documented mold infestations" at levels that testing later showed to be "extremely elevated." [D.E. 1 ¶ 25; FAMC ¶ 216]. A general awareness that mold might exist somewhere is not constructive knowledge that a particular home is infested, any more than a lineman's awareness that poles can rot was notice that a particular pole was rotten below ground. *See Robinson*, 68 So. 2d at 411-13. Hence this inference going to the merits of a defense cannot carry the day at this stage of the case.

Similarly, Defendants' reliance on the issue codes for "Mold" in Exhibits 3 and 5 cuts both ways: it shows that Balfour knew of a mold problem at 1102B Dewey Road, while the "Environmental Info" section it chose to include on the same document said nothing about it. Whether the issue codes sufficed to warn a cleaner, whose signed notes describe wiping up "construction debri[s]" after remediation, of a hazard to her own health, and whether the same was true of the other twenty listed homes and the hundreds unlisted, are questions of fact, not matters of pleading. *See Strickland*, 66 So. 3d at 1008 (describing *Pertl v. Exit Info. Guide, Inc.*, 708 So. 2d 956, 957–58 (Fla. 1st DCA 1997), which reversed summary judgment because material issues of fact existed as to the owner's constructive knowledge and duty to warn).

*Asbestos and lead*. Defendants are on firmer ground in observing that the SFC itself alleges the work orders "warned of 'potential presence of' asbestos-containing materials and lead-based paint." [D.E. 11 at 17 (quoting D.E. 1 ¶ 25)]. But the SFC also alleges that the work orders "did not disclose … the nature and scope of lead or

asbestos contamination." [D.E. 1 ¶ 25]. Whether a "may contain" disclaimer, coupled with a link to a survey report, adequately warned of the actual conditions in a given home, and whether the Figueroas were provided with or given the means to access the linked reports, are again factual questions. Note that the "Vendor acknowledges receipt of Enviro SNAP report" box on Defendants' own exemplar is unchecked[15]. [D.E. 11-3 at 3]. But even if the asbestos and lead theories are more problematic, the pleading does not foreclose them for Rule 12(b)(6) purposes.

*Discharge through the Vendor*. Defendants' even better argument is that, under *Indian River Foods*, notice to a contractor's "supervisory personnel" discharges the owner's duty. So notice to the Vendor through the Services Agreement was therefore notice to the Figueroas. [D.E. 11 at 18]. There is force to this argument, and it may need to be revisited after discovery, particularly because the record suggests that the Figueroas themselves became the Vendor's managers (or owners) in October 2022. By that point any notice to the Vendor may well have been notice *to them*. [D.E. 11-7].

But this issue cannot be resolved now, for three reasons. First, as explained above, the Services Agreement lies outside the pleadings. Second, *Indian River Foods* was decided after a full trial, on "undisputed" evidence that the contractor's top officials "were not only aware of the [specific] problem but were trying to remedy it." 660 So. 2d at 1095–96. The Agreement here shows only a generic acknowledgment

[15] And that Exhibits 4 and 6, which appear to be offered as the respective SNAP Reports for Exhibits 3 and 5, respectively, were generated in July 2026. [D.E. 11-4; 11-6].

that hazards "may" be present; it shows nothing about what the Vendor, or the Figueroas, actually knew of any particular home. Third, the Agreement post-dates the Figueroas' alleged first year of work; the Figueroas did not sign it and the record as to exactly when or how that occurred is yet undeveloped. What the Vendor's "supervisory personnel," whether or not the Figueroas, may have said, when, and about which homes, is a matter for discovery.

*Protective equipment.* Defendants observe that an independent contractor is generally responsible for equipping its own employees, *see Strickland*, 66 So. 3d at 1010, and that the Statement of Work placed that responsibility on the Vendor. [D.E. 11 at 12, 16; D.E. 11-1 at 33–40]. That may be so. But the SFC alleges that Balfour failed both to warn *and* to provide protective equipment, and the failure-to-warn theory is independently sufficient to sustain the negligence-based counts at this stage. Whether Balfour owed any separate duty with respect to equipment is a question the parties may address on a fuller record.

***5. The derivative counts***

Because Defendants challenge Counts III (gross negligence), V (negligent infliction of emotional distress), and X (medical monitoring) solely on the ground that no undischarged duty was owed [D.E. 11 at 18; D.E. 11-11 at 2, item 13], and because that ground fails, the Motion should be denied as to those counts as well. The undersigned expresses no view on whether those counts are otherwise adequately pleaded; Defendants have not raised any other challenge, and the Court will not construct one for them.

Accordingly, the Motion should be Denied as to Counts II, III, V, and X.

### *C. The Fraud-Based Claims (Counts XIX, XX, and XXI)*

The fraud-based counts present a different picture. Rule 9(b) unquestionably governs all three. Counts XIX and XX expressly allege fraud. Count XXI alleges negligent misrepresentation, which sounds in fraud under Florida law and is subject to Rule 9(b) in this Circuit. *Lamm*, 749 F.3d at 951 (citing *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1511 (11th Cir. 1993)); *Wilding*, 941 F.3d at 1127–28 (citing *Lamm* and *Souran*). And the Court has already directed that the requirements of Rule 9 "must be satisfied for any applicable claim in an individual Short Form Complaint." [Master D.E. 171 at 31]. The question now is whether the SFC meets that standard. It does not.

#### *1. The affirmative misrepresentations*

Under Florida law, fraudulent misrepresentation requires "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985) (emphasis omitted)). "Justifiable reliance is not a necessary element of fraudulent misrepresentation." *Ibid.* The policy behind this is to "prohibit one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing." *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336-37 (Fla. 1997) (analyzing *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla.

1980), which discusses the policy against using the law as a shield when guilty of fraud).

The only affirmative representation the SFC identifies is this: "When the Figueroa family began working for Balfour, Balfour represented that their work environment was safe." [D.E. 1 at 7 ¶ 25]. That sentence supplies the "what" in the most general terms and nothing else. It does not say who made the representation, either as to which of the five Defendants made the communication, or which individual acting for any of them. It does not say when, beyond "when [they] began working," which the SFC elsewhere places somewhere in 2021. It does not say where or how, whether the statement was made orally or in writing, in a contract, a safety briefing, an email, or a conversation. It does not even say what was actually said, beyond a conclusory description.

Faced with these supposedly "heightened" allegations, the Court cannot assess whether it was in fact a statement of fact that may be actionable, versus a generality or conclusion that may not be. And it does not say what any Defendant gained by it from which one can infer some form of intent on their part. In short, we have very little to go on in the SFC. Moreover, the Master Complaint's Counts XIX and XXI add no other detail; they allege only that Defendants "falsely assured Non-Resident Plaintiffs that they were being sent into safe working environments." [FAMC ¶¶ 399, 418].

Plaintiffs respond that "an allegation that a defendant represented that a work environment was safe obviously provides sufficient detail to put the defendant on

notice of the misconduct with which he has been charged." [D.E. 13 at 19–20 n.20]. It does not for a whole host of reasons. To begin with, five corporate Defendants, operating over a four-year period through an unknown number of employees, cannot identify from that sentence which of them is accused of saying what to whom, or when. That is the very "'spurious charge[]'" problem Rule 9(b) exists to prevent. *Ziemba*, 256 F.3d at 1202 (citing *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505 (11th Cir. 1988) ("The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.") (internal quotations and citation omitted)).

And the same holds true of the Plaintiffs' theory that such an allegation by itself is sufficient to plead "misconduct" for a fraud claim. To make such a claim Plaintiffs must navigate, with plausible factual allegations, a minefield of Florida caselaw that points in varying directions. "A claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact." *Thor Bear, Inc. v. Crocker Mizner Park, Inc.,* 648 So. 2d 168, 172 (Fla. 4th DCA 1994). But whether a given statement is fact or opinion is a contextual, threshold determination that "requires consideration of the surrounding circumstances." *Grimes v. Lottes,* 241 So. 3d 892, 896 (Fla. 2d DCA 2018). So, an untethered promise that a product or event is "safe" is routinely held to be non-actionable puffery. *See, e.g., Barham v. Royal Caribbean Cruises Ltd.,* 556 F. Supp. 3d 1318, 1326 (S.D. Fla. 2021) (collecting cases; "the general promise of a 'safe, reliable, licensed, excursion' is not actionable" (quoting

*Sanlu Zhang v. Royal Caribbean Cruises, Ltd.,* No. 19-20773-CIV, 2019 WL 8895223 (S.D. Fla. Nov. 15, 2019))).

But this general rule can be overcome under Florida's superior-knowledge exception that can convert an otherwise opinion-sounding statement into a statement of fact. *E.g., Mejia v. Jurich,* 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001); *Ramel v. Chasebrook Constr. Co.,* 135 So. 2d 876, 881-82 (Fla. 2d DCA 1961). Hence in the drug context, for instance, if supported by specific factual allegations a representation that a drug was "absolutely safe" has been deemed actionable. *Albertson v. Richardson-Merrell, Inc.,* 441 So. 2d 1146 (Fla. 4th DCA 1983). But that is only the case when the opinion-laden statement is accompanied with detailed allegations that support the other elements of the claim. *See, e.g., MDVIP, Inc. v. Beber,* 222 So. 3d 555, 561-63 and n.4 (Fla. 4th DCA 2017) (holding that non-opinion allegations did not sustain all elements of a fraud claim; exception to the rule, that an action for fraud may not be predicated on statements of opinion and must be based on a statement concerning a past or existing fact, did not apply without a showing of representations of and reliance on superior knowledge).

Plaintiffs' position here posits that a fraudulent misrepresentation claim can be sustained on non-detailed allegations tethered to promises of a "safe environment." Florida law, however, does not support that conclusion. Plaintiffs must instead allege plausible detailed allegations of who made the representations, what was specifically said, and the context in which they were made to support reliance. Without those

detailed allegations that Florida courts require to carve out an exception to the general rule, the current iteration of the SFC cannot sustain such a claim.

### *2. The concealment theory*

Count XX proceeds on a different fraud theory based on omission: having "started to provide" "some" safety information, Defendants had "a duty to disclose the whole truth" and failed to disclose mold. [FAMC ¶¶ 407, 411; *see* D.E. 1 ¶ 25]. Florida law recognizes such a fraud claim: "where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. 4th DCA 1994). And the theory has a plausible factual core, as Defendants' own exemplar shows: a work order that Balfour itself captioned "Mold," bearing an "Environmental Info" section that speaks only of asbestos and lead. [D.E. 11-3; 11-5].

Rule 9(b) does not require Plaintiffs to allege the "who, what, when, where, and how" of a scheme in the abstract; but for an omission claim it does require them to identify, at a minimum, the documents in which the omitted information should have appeared, the facts that were omitted, and the person or entity responsible for "not making" the disclosure. *Ziemba*, 256 F.3d at 1202 ("Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which

they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.") (internal quotation marks and citation omitted).

Again, even as to this omission theory, the SFC does not do so. It alleges that the Figueroas cleaned "hundreds of homes" and lists twenty-one, but it does not identify a single work order that omitted mold, the date of any such work order, or the home to which it related. It alleges that the environmental-info section "usually" failed to mention mold, which necessarily concedes that it sometimes did. It does not say which homes fall on which side of that line, or why the Figueroas, who by their own account received work orders that *did* mention mold, were misled by those that did not. It alleges that "many" of the listed homes had "documented mold infestations," but it does not allege that any Defendant knew of the infestation at any particular home *at the time* the relevant work order issued (a fact that would make the omission a knowing concealment rather than a later-discovered gap). And, as with the affirmative misrepresentation, it does not say which Defendant issued the work orders.

The SFC's checkbox section compounds the problem: asked whether Defendants provided documents describing environmental hazards before Plaintiffs entered homes, and whether those documents referenced lead, asbestos, or mold, Plaintiffs answered "No" to each. Yet, the Narrative alleges that the work orders did warn of asbestos and lead, and paragraph 19 alleges reliance on "those documents." [D.E. 1 ¶¶ 15–19, 25]. Plaintiffs candidly acknowledge these "apparent inconsistencies." [D.E. 13 at 18 n.16]. A fraud pleading that contradicts itself on

whether the allegedly misleading documents existed at all does not give Defendants fair notice of the "precise misconduct with which they are charged." *Ziemba*, 256 F.3d at 1202 (internal quotations and citation omitted).

#### *3. Plaintiffs' responses to the motion are not persuasive*

Plaintiffs offer four responses. None carries the day, although each has some merit that should inform the amended pleading.

First, Plaintiffs invoke the relaxed standard applicable where "factual information about the fraud is peculiarly within the defendant's knowledge or control." [D.E. 13 at 16 (quoting *Hill*, 2003 WL 22019936, at *3)]. That principle may have application to some of what Defendants demand. For instance, which Balfour entity employed the individuals who prepared the work orders is a fact Plaintiffs plausibly cannot know from documents issued under the trade name "NAS Key West Homes, A Balfour Beatty Community." [D.E. 13 at 19 n.18; D.E. 11-3 at 2]. To that extent, Rule 9(b) is satisfied by alleging the facts Plaintiffs do know: the trade name, the form, the position of the person who signed or transmitted the order, together with an allegation that the responsible entity is presently unknown to them and why. But the principle does not reach the core deficiencies identified above. The work orders were addressed to the Vendor and, on Defendants' exemplar, signed by Ms. Figueroa; the Figueroas were the Vendor's managers and its registered agent (at the very least). [D.E. 11-2; D.E. 11-3 at 3; D.E. 11-5; D.E. 11-7]. Which homes they cleaned, approximately when, which work orders mentioned mold and which did not, and what they were told when they "began working for Balfour" are facts within

Plaintiffs' own knowledge, not Defendants'. The relaxed standard does not excuse a plaintiff from pleading what she herself knows.

Second, Plaintiffs argue that the alleged fraud "occurred over a period of time" and that Rule 9(b) therefore requires only "a representative sample." [D.E. 13 at 16 n.15 (quoting *Hill*, 2003 WL 22019936, at *3 n.6)]. Maybe so, but that is precisely what the SFC lacks. Plaintiffs need not plead every work order for every one of "hundreds of homes." But they must plead *some*: a representative set of specific instances such as a home, approximate date, what the work order said and omitted, and the basis for alleging that Balfour then knew of mold at that home. Only from these detailed allegations can a plausible pattern be inferred. The Serop work orders in Defendants' own exhibits show the kind of detail that is available to them. [D.E. 11-3; 11-5].

Third, Plaintiffs contend that "lumping" the Defendants together is permissible here because the FAMC alleges, and the Court has accepted at the pleading stage, that the Balfour entities operate as "integrated, closely related components of one confusing conglomerate." [D.E. 13 at 18–19 (quoting FAMC ¶ 149)]; [Master D.E. 171 at 4–8]. The Court's May 14 Motion to Dismiss ruling [Master D.E. 171] on vicarious and direct liability means that a well-pleaded allegation that "Southeast Housing" or "Balfour Beatty Management," acting through a named or described individual making a particular misrepresentation could be attributed to the affiliated Defendants for pleading purposes. But it does not dispense with the

requirement to plead the underlying representation with particularity in the first place.

For instance, *Brooks* faulted a complaint not merely for naming multiple defendants but for "lump[ing] together all of the defendants in their allegations of fraud" without "specific allegations with respect to each defendant." *Brooks*, 116 F.3d at 1381, *cited in Ambrosia Coal*, 482 F.3d at 1317. The SFC's use of the undifferentiated term "Balfour" for both the speaker and the sender, without identifying any person, office, or document, is that kind of improper lumping. The cure is not to name all five Defendants in every sentence; it is to identify the speaker or document where Plaintiffs can, and to say why they cannot where they cannot.

Fourth, Plaintiffs rely on *Gose v. Native American Services Corp.*, 109 F.4th 1297 (11th Cir. 2024), and *Otto Candies, LLC v. Citigroup, Inc.*, 137 F.4th 1158 (11th Cir. 2025), for the proposition that Rule 9(b) is satisfied where the defendant "know[s] the details of the alleged fraud." [D.E. 13 at 15, 17, 20 n.21]. Those decisions confirm that Rule 9(b) is a notice rule, not a credibility contest, which the Court is applying here in that spirit. But in each case, the complaint deemed sufficient identified the specific transactions, documents, or statements alleged to be fraudulent. The defendants' still pressed was whether the plaintiff had to go further and the Eleventh Circuit held otherwise.

But in this case the SFC identifies *none*. Unlike *Gose*, where the defendants could prepare a defense by "reviewing the specific bids, task orders, and payment claims associated with those contracts," 109 F.4th at 1319, Defendants here cannot

do the equivalent because the SFC does not say which work orders, for which homes, on which dates, are at issue.

Plaintiffs' defenses of their sparsely detailed allegations of fraud do not pass muster. The SFC does not plead plausible claims of fraud, for either misrepresentations or omissions of material fact. Rule 9(b) requires dismissal.

***4. The remedy: dismissal without prejudice and leave to amend***

Defendants ask that Counts XIX, XX, and XXI be dismissed with prejudice, citing Plaintiffs' "repeated failure to cure deficiencies" across "four different complaints." [D.E. 11 at 20–21 (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005))]. This request should be rejected. Dismissal under Rule 9(b) is ordinarily without prejudice, because it is "a technical dismissal rather than on the merits." *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1328 (S.D. Fla. 2020).

The law on amendment in the Eleventh Circuit is generous, although it has limits. The 1992 case *Bank v. Pitt* instituted a rule that, "[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." 928 F.2d 1108, 1112 (11th Cir. 1992). By 2002, the Eleventh Circuit overruled *Bank*, to "substitute the following rule: A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff ,who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002). *Wagner*'s rationale was that the *Bank* rule gave a plaintiff "two bites at

the apple": "a plaintiff could sit idly by as he awaited the district court's determination with respect to a Rule 12(b)(6) motion to dismiss" until he appealed an adverse ruling "as long as it was a final judgment," and remand for reasons of the *Bank* rule would then take the form of the second "bite." *Id.* at 543. The *Wagner* rule pulls the rip cord quicker and, as the opinion notes, brings the Eleventh Circuit in line with other sister circuits.

There is, however, a throughline between these cases, including those of sister circuits: leave to amend still hinges on whether amendment would allow Plaintiff to state a claim for which relief could be granted. *See, e.g.*, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 76 (2d Cir. 1998) (rejecting the argument that the district court erred in dismissing the plaintiff's claims without leave to amend because the plaintiff never requested leave and also that "he has made no showing that he would be able to amend his complaint in a manner that would survive dismissal"); *Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994) (district court did not err where appellant did not request leave to amend and "has failed to indicate specifically how he would amend his complaint to overcome . . . dismissal").

Here, Plaintiffs have requested leave to amend in their Response [D.E. 13 at 11 n.10, 18 n.16, 21], so this is not a case in which the Court would be granting leave *sua sponte* to a counseled party that never asked for it. And we do not deem such amendment would undoubtedly be futile.

*Corsello*, a *qui tam* action, is inapposite. There, the district court had twice identified the specific deficiencies in the plaintiff's fraud allegations and twice

granted leave to amend, and the plaintiff twice failed to supply what the court had told him was missing. 428 F.3d at 1011–14. Here, no court has previously found the Figueroas' fraud allegations deficient. The earlier iterations of the master pleadings were amended for reasons unrelated to Rule 9(b), including the jurisdictional and structural concerns discussed at the January 20, 2026 status conference [Master D.E. 134]. The Court's May 14, 2026 Order [Master D.E. 171], that first announced that the Short-Form Complaints must satisfy Rule 9(b), issued only a month before the SFC was filed.

Nor is amendment necessarily futile. Defendants' own exhibits show that specific work orders, with dates, addresses, captions, and environmental-information text, exist and are identifiable; Plaintiffs have represented that they can supply further detail. [D.E. 13 at 18 n.16]. This is the first, and should be the only, opportunity to do so.

To satisfy Rule 9(b) and the Court's May 14, 2026 Order, any amended SFC should, at a minimum: (a) identify, for the affirmative "safe working environment" representation, who made it (by name, or by position and the Balfour entity or trade name under which the person acted, if the name is unknown), when (at least by month and year), where and how (orally or in what document), and what was actually said; (b) identify a representative set of specific work orders alleged to have omitted mold—by home, approximate date, and the content of the environmental-information section—and allege the factual basis for Plaintiffs' contention that Balfour knew of mold at that home when the work order issued; (c) identify, to the extent known, the

Balfour entity or entities that issued the work orders, and where unknown, so state and explain; (d) allege what Plaintiffs contend Defendants gained from the alleged misrepresentations and omissions; and (e) conform the checkbox responses in Section IV to the Narrative, or explain the apparent inconsistencies. Nothing in this Report should be read to require Plaintiffs to plead every instance of alleged concealment over four years, or to name individuals whose identities are genuinely unavailable to them. It only finds that the current generic, broadly-phrased allegations cannot sustain fraud claims under Florida law.

Accordingly, the motion to dismiss should be Granted in part as to Counts XIX, XX, and XXI, with leave to amend.

## *V. CONCLUSION AND RECOMMENDATION*

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion to Dismiss the Figueroa Family's Short-Form Complaint [D.E. 11] be **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. The Motion should be **DENIED** insofar as it seeks dismissal under Rule 12(b)(7) and Rule 19, without prejudice to Defendants' right to renew the argument on a developed record.

2. The Motion should be **DENIED** as to Counts II, III, V, and X of the Short-Form Complaint [D.E. 1].

3. The Motion should be **GRANTED IN PART** as to Counts XIX, XX, and XXI, which should be **DISMISSED WITHOUT PREJUDICE** for failure to satisfy Rule 9(b). Plaintiffs should be granted leave to file an

amended Short-Form Complaint repleading Counts XIX, XX, and XXI in conformity with Part IV.C.4 of this Report within twenty-one (21) days of the District Court's Order adopting this Report. Should Plaintiffs fail to timely amend, Counts XIX, XX, and XXI should stand dismissed but with prejudice.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. §636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767 (11th Cir. 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 16th day of September, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge